1
2
3
4
5
6                          **UNITED STATES DISTRICT COURT**

7                              **DISTRICT OF NEVADA**

8   EVERETT WALKER,                          Case No.: 3:16-cv-00455-MMD-WGC

9        Plaintiff,                          **Report & Recommendation of**
                                             **United States Magistrate Judge**
10  v.
                                             Re: ECF No. 55
11  ROMEO ARANAS, *et al*.,

12       Defendants.

13

14      This Report and Recommendation is made to the Honorable Miranda M. Du, United States

15  District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C.

16  § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

17      Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 55, 55-1 to 55-

18  10, and sealed medical records at 57-1 to 57-9.) Plaintiff filed a response. (ECF No. 61.)

19  Defendants filed a reply. (ECF No. 62.)

20      Plaintiff recently filed a motion for additional discovery under Federal Rule of Civil

21  Procedure 56(d), which the court has denied in a separate order.

22      After a thorough review, it is recommended that the motion for summary judgment be

23  granted in part and denied in part.

# I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 34.) The events giving rise to this action took place while Plaintiff was housed at High Desert State Prison (HDSP). (*Id.*) Defendants are Shannon Moyle, Isidro Baca, Jacob Murphy, Tito Buencamino, and Dr. Romeo Aranas. (*See* ECF Nos. 27, 33, 34.) Dr. Karen Gedney was dismissed under Federal Rule of Civil Procedure 4(m) because Plaintiff failed to timely serve her with the amended complaint. (*See* ECF No. 64.)

The amended complaint was screened and Plaintiff was allowed to proceed with claims for violation of the Americans with Disabilities Act (ADA) and Eighth Amendment deliberate indifference to serious medical needs. (*See* ECF Nos. 27, 33.)

Plaintiff alleges that he suffered from a crippling degenerative hip condition and had a medical order for a wheelchair as well as a "flat yard" restriction. (ECF No. 34 at 4 ¶¶ 1-3.) He claims that Defendants refused to provide him with necessary, physician-ordered hip replacement surgery; effective pain medication to treat pain associated with his degenerative hip disease; and transferred him to a non-ADA compliant facility where he was deprived of a wheelchair for sixteen months despite the fact that there was a medical order stating he required a wheelchair and a "flat yard." Specifically, he alleges that in early 2015, Moyle and Baca classified him to be transferred from Northern Nevada Correctional Center (NNCC) to HDSP, knowing of his medical restrictions. (*Id.* ¶¶ 4-5.) He claims that HDSP was not a "flat yard," and that it had a policy prohibiting the use or possession of wheelchairs. (*Id.* ¶ 6.) As a result of their decision to transfer him, he claims that he suffered in pain for sixteen months without a wheelchair. (*Id.* ¶ 7.)

Once at HDSP, he filed an informal level grievance. (ECF No. 34 at 5 ¶¶ 8-9.) Murphy responded to the grievance, but Plaintiff claims she ignored his complains of pain, and took no effort to see that he got a wheelchair, walker or handicap cell, and this exacerbated his hip condition. (*Id.* ¶¶ 10-12.)

He filed a first level grievance complaining of pain and requesting a wheelchair and corrective hip surgery. (*Id.* ¶ 14.) Buencamino responded, stating that Plaintiff was scheduled to be seen by a medical provider, and that he should use the "man-down" procedure if he had any life-threatening medical issues. (*Id*. ¶ 15.)  Again, Plaintiff alleges his requests for a wheelchair, pain relief and surgery were ignored. (ECF No. 34 at 6 ¶¶ 16-17, 20.) He claims that as a result, he was unable to exercise and gained 50 pounds which exacerbated his hypertension and hip condition, and he fell on numerous occasions. (*Id.* ¶¶ 18-19.)

He filed a second level grievance complaining of extreme pain caused by  his hip condition and requested hip replacement surgery along with a wheelchair to accommodate his condition. (*Id*. ¶ 21.) He attached a copy of the order for hip surgery. (*Id*. ¶ 22.) Dr. Aranas responded, and Plaintiff claims he ignored Plaintiff's medical concerns, including the need for a wheelchair and hip replacement surgery. (*Id*. ¶¶ 23-24.)  Before an inmate can receive off-site surgery such as a hip replacement surgery, he must first receive approval from the Utilization Review Panel (URP). (Id. ¶ 25.) Aranas was the chief presiding officer of the URP, but Plaintiff alleges that he ignored Plaintiff's condition and failed to submit Plaintiff's case concerning hip replacement surgery to the panel. (*Id*. ¶ 26.)

Based on these facts, Plaintiff asserted fifteen distinct counts. Counts  II, IV, V, VII, VIII, XI, XII, XIV, and XV (which asserted due process violations and medical malpractice claims) were dismissed. (ECF Nos. 27, 33.) Count XII was asserted against Gedney, and she has also been

dismissed. (ECF No. 64.) Therefore, the amended complaint is only proceeding with respect to Counts I, III, VI, IX, and X.

In Count I, Plaintiff alleges that Moyle and Baca were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment when they knew of his restrictions, yet transferred Plaintiff to HDSP. (ECF No. 34 at 8.)

In Counts III, VI and X, Plaintiff alleges that Murphy, Buencamino and Dr. Aranas were deliberately indifferent to his serious medical need when they refused to provide Plaintiff with a wheelchair, walker or handicap cell. (ECF No. 34 at 9-10.)

In Count IX, Plaintiff alleges that Dr. Aranas violated his Eighth Amendment rights when he intentionally denied Plaintiff access to physician-ordered medical care in the form of surgery by refusing to submit Plaintiff's claim to the URP. (ECF No. 34 at 10.)

Defendants argue: (1) the decision to transfer Plaintiff to HDSP for medical treatment was made by Dr. Marsha Johns and not Baca or Moyle; (2) Murphy, Buencamino and Aranas were not deliberately indifferent to Plaintiff's serious medical needs as his medical needs were being addressed and they did not personally participate in the alleged constitutional violation; (3) Plaintiff failed to exhaust his administrative remedies with respect to the ADA claims; and, (4) they are entitled to qualified immunity.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted). "The court shall grant summary judgment if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-50. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmoving party is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

## III. DISCUSSION

### A. Count I–Baca and Moyle

Defendants argue that the decision to transfer Plaintiff to HDSP for medical treatment was made by Dr. Johns and not Baca or Moyle. (ECF No. 55 at 6-7.) Specifically, Dr. Johns decided Plaintiff needed to be seen by Dr. Hillock for removal of a large mass on his right hand.

*///*

1    Plaintiff concedes that Baca and Moyle "did nothing wrong." (ECF No. 61 at 4.)

2    Therefore, summary judgment should be granted in favor of defendants Baca and Moyle.

3    **B. ADA**

4    Defendants contend that Plaintiff failed to exhaust his administrative remedies with respect

5    to the ADA claims. Specifically, they argue that the grievance filed about his wheelchair did not

6    state he was unable to use the showers or toilet, and it acknowledged food was being brought to

7    him by officers or served in the unit. They contend he did not raise an issue about being denied

8    access to facilities or make a request for accommodation for a disability.  Plaintiff's opposition

9    does not address this argument.

10    The Prison Litigation Reform Act (PLRA) provides that "[n]o action shall be brought with

11    respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner

12    confined in any jail, prison, or other correctional facility until such administrative remedies as are

13    available are exhausted." 42 U.S.C. § 1997e(a). This is typically done by utilizing a prison's

14    grievance procedure.

15    The PLRA requires "proper exhaustion," which refers to "using all steps the agency holds

16    out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v.*

17    *Ngo*, 548 U.S. 81, 89 (2006). As such, "[s]ection 1997e(a) requires an inmate not only to pursue

18    every available step of the prison grievance process but also to adhere to the 'critical procedural

19    rules' of that process." *Reyes v. Smith*, 810 F.3d 654, 657 (9th Cir. 2016). "[I]t is the prison's

20    requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*,

21    549 U.S. 199, 218 (2007).

22

23

1    NDOC's grievance process is set forth in Administrative Regulation (AR) 740. (ECF No.

2 55-6.) An inmate must try to informally resolve an issue and then proceed through three grievance

3 levels—informal, first and second—to exhaust administrative remedies before filing a lawsuit.

4    The Ninth Circuit has specifically held that an inmate must exhaust his administrative

5 remedies before bringing a claim under the ADA. *O'Guinn v. Lovelock Corr. Ctr.*, 502 F.3d 1056,

6 1060 (9th Cir. 2007).

7    The ADA provides that "no qualified individual with a disability shall, by reason of such

8 disability, be excluded from participation in or be denied the benefits of the services, programs, or

9 activities of a public entity, or be subject to discrimination by any such entity." 42 U.S.C. §12132.

10 It applies in the prison context. *See United States v. Georgia*, 546 U.S. 151, 154 (2006) (citation

11 omitted) (affirming that state prisons qualify as a "public entity" under Title II of the ADA);

12 *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1063 (9th Cir. 2010) (citations omitted).

13    A grievance is sufficient "if it alerts the prison to the nature of the wrong for which redress

14 is sought." *Sapp v. Kimbrell*, 623 F.3d 813, 824 (9th Cir. 2010) (quoting *Griffin v. Arpaio*, 557

15 F.3d 1117, 1120 (9th Cir. 2009)). The grievance "need not include legal terminology or legal

16 theories" as its "primary purpose ... is to alert the prison to a problem and facilitate its resolution,

17 not to lay groundwork for litigation." *Griffin*, 557 F.3d at 1120.

18    The allegations of the amended complaint that implicate the ADA are: at HDSP, Plaintiff

19 was on a non-flat yard and was deprived of a wheelchair which resulted in difficulty attempting to

20 use the toilet and shower, walking to the dining hall, and participating in activities, services and

21 programs. (ECF No. 34 at 5.)

22    For exhaustion purposes, AR 740 requires an inmate to provide all documentation and

23 factual allegations at the informal level. (ECF No. 55-6 at 7, AR 740.05.A.)

1    To support their argument that Plaintiff did not grieve the ADA issue, Defendants submit

2  documentation pertaining to grievance 20063008487. (ECF No. 55-7.)

3    Defendants' documentation includes an informal level grievance dated August 19, 2015.

4  (ECF No. 55-7 at 12.) It states that when he was transferred to HDSP on March 17, 2015, he told

5  medical personnel he had been in a wheelchair. It appears the remainder of this informal level

6  grievance was not provided by Defendants. In a subsequent informal level grievance, Plaintiff

7  explains that he started the grievance process in June, but was told in July that his grievance was

8  not received. This led him to file another informal level grievance on August 19, 2015, but he had

9  heard nothing back as of September 20, 2015, so he filed yet another informal level grievance

10  dated September 27, 2015. (*See* ECF No. 55-7 at 5-8.) Thus, it appears that the latter is the

11  operative informal level grievance on this issue.

12    While the chronology of the grievance documentation is certainly confusing, the informal

13  level grievance submitted on September 27, 2015, does not put prison officials on notice of an

14  ADA claim.  Plaintiff complains of not being provided with a medically ordered wheelchair, and

15  the resulting pain he suffered, but he did not include facts that he was being denied access to

16  services, programs or activities within the prison. Instead, he made clear his needs were being met

17  (in terms of meals), but he was still in pain.

18    Plaintiff provides no argument or evidence to demonstrate that he did in fact grieve the

19  ADA claims or that administrative remedies were otherwise unavailable to him. Therefore, it is

20  recommended that Defendants' motion be granted with respect to the ADA claims.

21  ///

22  ///

23  ///

**C. Counts III, VI, IX, and X**

      **1. Eight Amendment Standard**

      A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

      If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under

section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).  "'[A] prisoner need not prove that he was completely denied medical care' in order to prevail" on a claim of deliberate indifference. *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (quoting *Lopez*, 203 F.3d at 1132), *overruled on other grounds*, *Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). Where delay in receiving medical treatment is alleged, a prisoner must demonstrate that the delay led to further injury. *McGuckin*, 974 F.2d at 1060.

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

///

///

### 2. Facts

While housed at NNCC, Plaintiff was issued a cane for his hip issue on October 7, 2014. (ECF No. 55-1 at 3; ECF No. 57-6 at 2.) He then sent a request for a wheelchair on October 9, 2014, indicating the cane was not helping. (ECF No. 57-1 at 2.) He was seen regarding his wheelchair request on October 23, 2014. (ECF No. 57-2 at 10.) He complained of having to stand for extended periods of time with significant pain in his left hip. (*Id.*) The downsides of wheelchair use (deconditioning) were discussed, and Plaintiff indicated he understood and insisted he would use it to walk behind it and for sitting when there were lines, etc. (*Id.*) They also discussed weight management. (*Id.*) He was given Tylenol and ibuprofen to alternate. (*Id.*) The wheelchair was ordered, with a notation that it was for six-months. (*Id.*; ECF No. 57-3 at 2; ECF No. 57-6 at 2.)The wheelchair order stated Plaintiff needed total hip replacement surgery; that he was in significant pain; and, that he was unable to stand for extended periods of time. (ECF No. 57-3 at 2.)

On January 7, 2015, he was referred to an orthopedic surgeon, Dr. Hillock, regarding a large mass in his right hand. (ECF No. 57-5 at 2.)

He was transferred to HDSP on March 17, 2015. (ECF No. 55-1 at 3.)

He saw Dr. Hillock on March 30, 2015, and hand surgery was recommended. (ECF No. 57-5 at 3-4.)

Plaintiff submitted an informal level grievance at HDSP on August 19, 2015, indicating he had been denied a wheelchair. (ECF No. 55-7 at 12.)

On September 8, 2015, he was referred to see Dr. Wulff regarding his hip. (ECF No. 57-6 at 4.)

On September 27, 2015, he submitted another informal level grievance. (ECF No. 55-7 at 5-8.) He told prison officials that he had been ordered a wheelchair for severe pain related to his

hip, but he had been informed on August 17, 2015, that wheelchairs were not permitted at HDSP. He stated that he was still in severe pain and asked them to contact someone at NNCC to confirm the wheelchair order.

Plaintiff also submitted a first level grievance on September 27, 2015, stating that he had been denied access to a wheelchair that had been ordered for a condition affecting his leg and hip. (ECF No. 55-7 at 3-4, 10.)

Sometime between September 24, 2015 and October 2, 2015, Murphy responded to the informal level grievance, stating: Plaintiff was seen by an outside surgeon and HDSP provider within two weeks of his transfer to HDSP; he was given a cane to assist with ambulation and was prescribed medication; saw the provider again on May 10, 2015 and September 3, 2015, and additional medications were ordered; he was in a unit where walking was limited and all his meals were served in the unit; he was scheduled to see the hand surgeon and orthopedic surgeon for a possible referral for hip replacement; and, if he had additional concerns he should kite or go to nursing sick call. (ECF No. 55-7 at 11.)

On October 14, 2015, it was noted that he was seen for a left hip issue and that he was ambulating with a cane and had a limp. His weight was noted as being a problem, and an x-ray was ordered before he was to see Dr. Wulff. (ECF No. 57-2 at 5-6.)

There is a notation dated December 14, 2015, that there was a URP request received regarding Dr. Wulff (presumably to approve the referral to Dr. Wulff). (ECF No. 57-2 at 4.)

On January 13, 2016, Plaintiff complained of hip pain and was referred to a doctor. He asked to change Tylenol to ibuprofen. (ECF No. 57-2 at 4.)

There is another first level grievance that is not dated by Plaintiff, but appears to be signed by the grievance coordinator on January 20, 2016; however, the grievance is illegible and the entirety of the grievance does not appear to have been attached. (ECF No. 55-7 at 14.)

On January 26, 2016, Buencamino responded to Plaintiff's first level grievance, and told Plaintiff he was scheduled to be seen and evaluated by the provider and that was his chance to "re-discuss [his] medical issues and concerns." He was advised that if he had any "life threatening issues" to use the "man-down" procedure. (ECF No. 55-7 at 13.)

On February 12, 2016, Plaintiff complained of left hip pain. It was noted that he was scheduled to see Dr. Hillock for hand surgery on March 10, 2016. (ECF No. 57-2 at 4.)

On February 16, 2016, he submitted his second level grievance. Defendants did not provide the second level grievance documentation, but according to Plaintiff's amended complaint he complained of extreme pain from his hip and requested hip replacement surgery and a wheelchair to accommodate his condition.

On February 17, 2016, Plaintiff was seen in response to an emergency grievance and claimed he was on the list for a hip replacement. He said the Tylenol was not helping and he wanted ibuprofen. (ECF No. 57-2 at 4.)

On March 22, 2016, plaintiff claims that Dr. Aranas responded to his second level grievance. Again, Defendants did not provide the second level grievance documentation, but Plaintiff's amended complaint alleges that Dr. Aranas summarized the care Plaintiff had received, but Plaintiff contends he did not address his chronic pain, need for a wheelchair, or request for hip replacement surgery.

On March 31, 2016, he complained of knee and hip pain and asked to be transferred to a disability cell. He was advised that that was not within the medical department's authority and he

14

1  would need to speak to his caseworker. He was walking with a limp and using a cane at that point.

2  (ECF No. 57-2 at 3, 8.)

3       On May 1, 2016, he requested ibuprofen for his hip pain. (ECF No. 57-2 at 3.)

4       Plaintiff was transferred back to NNCC on June 9, 2016. (ECF No. 55-1 at 3.)

5       Progress notes dated June 22, 2016, stated that Plaintiff complained he was unable to walk

6  to eat and needed a wheelchair. He was given a wheelchair as well as ibuprofen and was referred

7  to Dr. Long. (ECF No. 57-2 at 2.)

8       On July 10, 2017, he saw Dr. Walls who indicated that Plaintiff was using a wheelchair

9  and reported he could walk 40 feet to the showers, but had constant left hip pain. Dr. Walls noted

10 that the surgical options were left total hip replacement or left hip fusion and surgery was the only

11 option for pain control, but Plaintiff's age and weight made total hip replacement difficult as he

12 may need future revision hip surgery. (ECF o. 57-8 at 2.)

13      There is a July 12, 2017 order from Dr. Johns to send Plaintiff to HDSP for a consult with

14 Dr. Wulff for consideration of left total hip replacement. Dr. Johns noted previous consults with

15 Dr. Walls in 2014, 2016, and 2017, with the same recommendations for total hip replacement. The

16 URP authorized the referral. (ECF No. 57-7 at 4; ECF No. 57-8 at 3.)

17      Plaintiff was transferred to HDSP on January 9, 2018. (ECF No. 55-1 at 18.)

18      Plaintiff saw Dr. Wulff on March 19, 2018, who recommended an evaluation by Dr.

19 Sylvain to see if he would do a total hip replacement given Plaintiff's weight. If not, Dr. Wulff

20 indicated he could remove the two screws in Plaintiff's hip to see if it would help, but he still

21 needed to be under 250 pounds for that procedure. Dr. Wulff recommended a flat yard and to

22 resume ibuprofen. (ECF No. 57-8 at 4.)

23 ///

**3. Analysis**

      **a. Counts III, VI and X**

Plaintiff alleges Murphy, Buencamino and Dr. Aranas were deliberately indifferent in refusing to provide him with a wheelchair, walker or handicap cell.

Dr. Aranas, Buencamino and Murphy argue that they did not personally participate in any alleged constitutional violation as they only responded to grievances. (ECF No. 55 at 10-11.) Murphy and Buencamino were nurses, and they assert that Plaintiff did not allege they had authority to order him a wheelchair or that they provided him with any care or refused to provide him with treatment.

Defendants' argument that they cannot be held liable because they were only responding to grievances fails. This issue was addressed in *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012), *overruled on other grounds in Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014). In *Snow*, the inmate plaintiff had submitted several grievances about the denial of a recommended hip surgery; there was testimony that the warden and associate warden were aware of the grievances, and that they had reviewed an order stating that the inmate needed a hip replacement. *Snow*, 681 F.3d at 989. The Ninth Circuit said this was sufficient to demonstrate that the warden and associate warden were aware of the inmate's serious hip condition and failed to act to prevent further harm so that the warden and associate warden were not entitled to summary judgment. *Id.*

The argument that Murphy and Buencamino cannot be held liable because they did not have authority to order a wheelchair is also unavailing. Whether or not they had authority to actually order the wheelchair is immaterial to whether they knew of and disregarded a serious risk to Plaintiff's health in failing to address his request for a wheelchair.

When Murphy received Plaintiff's informal level grievance in late September or early October of 2015, Plaintiff had been ordered a wheelchair by Dr. Gedney. The order is from October 2014, and while it was for 6 months, the order was given at NNCC and Plaintiff was transferred to HDSP on March 17, 2015, before the order expired. Despite advising prison officials at HDSP of the prior wheelchair order, it seems no one investigated it or contacted NNCC to determine whether the order should continue, or even examine him for this purpose. The October 2014 wheelchair order specifically stated that Plaintiff needed a total hip replacement; he was in significant pain; and, he was unable to stand for extended periods of time. Plaintiff specifically stated in his grievance that he was still in severe pain, and reiterated his request that NNCC be contacted to confirm the wheelchair order. While Murphy stated that Plaintiff had been given a cane and was in a unit where walking was limited, she did not specifically address his request for a wheelchair, the prior order for the wheelchair, Dr. Gedney's conclusions in the order that he was in significant pain and was unable to stand for extended periods of time or the note in his record that when he had a cane previously it did not help.

All of this was also in Plaintiff's records by the time Plaintiff sent his first level grievance, and in addition, he continued to complain of hip pain, and was noted as ambulating with a limp while utilizing a cane. On January 26, 2016, Buencamino told Plaintiff he was scheduled to be seen, but ignored his request for a wheelchair. In fact, Plaintiff continued to complain of left hip pain and then filed not only his second level grievance requesting hip replacement and surgery, but also an emergency grievance about his pain.

While Murphy and Buencamino may not have been authorized to actually order the wheelchair, they could have taken action to address his request.

This was the status of things when Dr. Aranas received the second level grievance. Defendants did not include the second level grievance documentation to allow the court to determine Dr. Aranas' specific response, but Plaintiff's amended complaint indicates that Aranas did not address the need for a wheelchair (or request for hip replacement surgery). This is confirmed by Plaintiff's medical records which establish that Plaintiff's request for a wheelchair was not addressed until after he had returned to NNCC in June of 2016, and that he did not see a specialist about his hip until March of 2018.

In sum, there are facts in the medical records that raise a genuine dispute as to whether Murphy, Buencamino and Dr. Aranas were deliberately indifferent in ignoring Plaintiff's request for a wheelchair. Therefore, summary judgment should be denied as to Counts III, VI, and X.

### b. Count IX

In Count IX, Plaintiff alleges that Dr. Aranas violated the Eighth Amendment by denying him hip surgery when he failed to refer Plaintiff to the URP for total hip replacement surgery. (Count IX).

Defendants' motion argues that they were not deliberately indifferent to Plaintiff's hip pain. They contend that he received numerous prescriptions for pain medication, and he was transferred back to HDSP on January 9, 2018, for a consultation with a specialist regarding total hip replacement surgery. (ECF No. 55 at 7.)

In *Snow*, the defendants provided medical care, medications and specialist referrals. *Snow*, 681 F.3d at 986. The Ninth Circuit noted: "[e]ven so, '[a] prisoner need not prove that he was completely denied medical care' in order to prevail." *Id*. (quoting *Lopez v. Smith*, 203 F.3d 1122, 1132 (9th Cir. 2000) (en banc). Instead, the inmate could prove deliberate indifference by demonstrating "prison administrators or physicians denied, delayed, or intentionally interfered

with surgery for his hip condition, or that the way prison staff delivered medical care indicated deliberate indifference." *Id*.

There is evidence in the record to create a genuine dispute of material fact as to whether Dr. Aranas was deliberately indifferent to Plaintiff's serious medical need with respect to his request for hip surgery.

Dr. Gedney's October 2014 wheelchair order stated Plaintiff was in significant pain and could not stand for extended periods of time and needed total hip replacement surgery. He was transferred to HDSP in mid-March of 2015, but not referred to see Dr. Wulff regarding his hip until September 8, 2015. Before and after this referral, Plaintiff complained of pain in his hip and asked for a wheelchair and hip surgery. It does not appear he saw Dr. Wulff in the period he was housed at HDSP from March of 2015 until June of 2016. When he went back to NNCC, he almost immediately complained of pain and the need for a wheelchair. At that time, Dr. Johns stated that surgery was the only option for pain control and his options were a total hip replacement or hip fusion. It was noted that his age and weight made total hip replacement a difficult option because he might need a revision in the future, but it did not retract the conclusion that surgery was necessary to alleviate his pain.

On July 12, 2017, Dr. Johns referred Plaintiff back to HDSP for a consultation with Dr. Wulff, since Plaintiff had apparently not seen Dr. Wulff in the fifteen months he spent at HDSP where he continually complained of his hip pain. Though they do not appear to be in the records provided by Defendants, Dr. Johns noted that Plaintiff had previously consulted with Dr. Walls in 2014, 2016, and 2017, and each time there was a recommendation for total hip replacement. The URP authorized the referral back to HDSP, but Plaintiff did not arrive there until January of 2018, and did not see Dr. Wulff until March 19, 2018.

Dr. Wulff recommended an evaluation by another doctor to see if that doctor would do the hip replacement surgery in light of Plaintiff's weight, noting that if he would not, then Dr. Wulff could remove the screws currently in Plaintiff's hip to try and alleviate the pain, but he would still need to be 250 pounds.

As of the time the briefing was submitted, there was still a question about whether total hip replacement surgery would be performed, but the facts are clear that as of the time Dr. Aranas received Plaintiff's second level grievance, Plaintiff was complaining of pain and there were several recommendations for total hip replacement and a referral to see Dr. Wulff, yet Plaintiff did not even see Dr. Wulff for another two years. In other words, there is a genuine dispute of material fact as to whether Dr. Aranas was deliberately indifferent in delaying Plaintiff care for his hip.

There might have been a difference of opinion between Dr. Aranas and Plaintiff regarding how to proceed concerning Plaintiff's condition, but taking the facts in the light most favorable to Plaintiff, a fact finder could conclude that such a delay was not medically acceptable under the circumstances, and was in conscious disregard of a serious risk to Plaintiff's health.

**D. Qualified Immunity**

Finally, Defendants argue they are entitled to qualified immunity.

The qualified immunity analysis consists of two steps: (1) viewing the facts in the light most favorable to the plaintiff, did the defendant violate the plaintiff's rights; and (2) was the right clearly established at the time the defendant acted. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc), *cert. denied*, 137 S.Ct. 831 (Jan. 23, 2017).

Whether a right is clearly established turns on the objective reasonableness of the action. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullinex v. Luna*, 136 S.Ct. 305, 308

(2015) (internal quotation marks and citation omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011). Thus, courts begin the "inquiry into whether [the] constitutional violation was clearly established by defining the law at issue in a concrete, particularized manner." *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017). Clearly established law should not be defined "at a high level of generality." *al-Kidd,* 563 U.S. at 742. "'Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Ames v. King County, Washington,* 846 F.3d 340, 347-48 (9th Cir. 2017) (quoting *Stanton v. Sims,* 134 S.Ct. 3, 5 (2013)).

First, viewing the facts in the light most favorable to the Plaintiff, it could be concluded that Defendants' violated Plaintiff's Eighth Amendment rights.

Second, Plaintiff's rights were clearly established at the time of the events in question. It was clearly established that when a prison employee denies, delays, or interferes with medical care, it violates the Eighth Amendment. *See Snow*, 681 F.3d at 986. *Snow* specifically addressed the denial or delay of care in the context of a recommended hip surgery.

Therefore, Defendants are not entitled to qualified immunity.

### IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order as follows:

(1) **GRANTING** summary judgment in favor of Moyle and Baca in Count I;

(2) **GRANTING** summary judgment in favor of defendants insofar as the ADA claims are concerned; and

(3) **DENYING** summary judgment as to Counts III, VI, IX, and X.

21

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: December 4, 2018.

_____
William G. Cobb
United States Magistrate Judge